UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                                                         **DEFENDANT'S**
                                           **SENTENCING MEMORANDUM**

      v.

                                                    Criminal Action Number:
                                                      5:05-CR-293 (DNH)

      **JOHN F. REAP,**
                    **Defendant.**

---

## PROCEDURAL HISTORY AND BACKGROUND

      John F. Reap stands before this Court for sentencing subsequent to entry of a pleas of guilty pursuant to the terms of a written Plea Agreement. The Court is in receipt of the Pre-Sentence Investigation Report, together with the Sentencing Memorandum of the United States.

      In this Sentencing Memorandum, Counsel speaks on behalf of John, in counterpoint to the recommended sentence, which is based upon calculation of the numerical level assigned to this offense on the guidelines chart.

      The sentencing calculations contained in the Presentence Investigation Report are mathematically justifiable, and in the main, easily sustained. The guidelines would therefore consider this sufficient enough consideration of this man's case. As his counsel, I do not.

## PLEA AGREEMENT

John Reap entered into a written Plea Agreement with the government. He thereafter entered pleas of guilty in open court to Count 1of the Indictment admitting to Knowingly Transporting and Shipping Child Pornography in Interstate Commerce in violation of 18 U.S.C. §2252A(a)(1), and to Count 2, admitting Possession of Ammunition by a Prohibited Person in violation of 18 U.S.C. §922 (g)(1). The written Plea Agreement also contained provisions with respect to forfeiture and abandonment of property.

## ACCEPTANCE OF RESPONSIBILITY

John Reap fully accepts responsibility for his criminal conduct. He has entered his pleas of guilty willingly and voluntarily thereby acknowledging his guilt. He freely admitted the underlying factual basis for his pleas, as more specifically detailed in the Plea Agreement.

Additionally, the defendant accepted responsibility for purposes of the Presentence Investigation Report, and the Report reflects the acceptance with a three-level reduction.

John knows what he did was wrong, and is duly and thoroughly remorseful and profoundly contrite, to the point of seriously and negatively affecting his mental health.

The conduct described is reprehensible and disgusting. It invites opprobrium and evokes visceral disgust in anyone. The prosecution can say nothing worse about this than we are here saying ourselves, and which John has already admitted to and acknowledged.

Nonetheless, the abhorrent and revolting subject matter is still not in and of itself enough to authorize or validate a wholly unrestrained sentencing in John's case. It does not give license to abandon an examination of who John is, what his specific conduct was, and what in fact should be a fair and just sentence under all of the circumstances.

What follows in this Memorandum is not an attempt to reduce John's culpability, nor the significance and sincerity of his acceptance of responsibility. The arguments advanced here are derived directly from the guidelines themselves, as well as from 18 U.S.C. §3553(a), and the totality of the attendant surrounding facts and circumstances. Accordingly, they are based upon applicable law.

The sentencing recommendations for a non-guidelines sentence, and/or downward departure applications, contained herein apply without vitiating or abrogating acceptance of responsibility.

## POTENTIAL STATUTORY SENTENCES

On Count 1, John Reap faces a mandatory minimum term of imprisonment of five years and a maximum term of twenty years pursuant to 18 U.S.C. §2252A(b)(1). On Count 2, there is no mandatory minimum term of imprisonment, but a maximum term of ten years pursuant to 18 U.S.C. §922(g)(1). As the sentencing for Count 2 is in effect absorbed into the sentencing for Count 1, this Sentencing Memorandum will primarily address the Count 1 guidelines.

## SENTENCING MATTERS PRESENTED

The Sentencing Commission, through the guidelines as approved by Congress, would leave very little, if any, discretion with the sentencing Judge in a case under this Article. If the guidelines were mandates, or even presumptive, there would also be very little that would be allowed to be presented by counsel, or advocated for on behalf of a defendant.

The matter would effectively be taken out of the hands of the sentencing Judge, irrespective of the Judge's greater familiarity with the all of the facts and circumstances pertaining to an offense and an offender, and even though the sentencing Judge is therefore in a far better position to craft and fashion a just sentence, with the flexibility that individualized sentencing envisions and requires.

As can be seen here from the arithmetically calculated guidelines computation, and especially as can be witnessed in the sentencing enhancements, exponentially applied here resulting in these astronomically, inordinately high numbers, this case is a prime example of why the mandatory nature of the mechanistic guidelines was done away with.

This is especially so given the Criminal History Category of I. The sentencing calculations come down harder than they must. The enhancements are too many. The enhancements are too great.

A sufficient and complete accounting can be made here, without the full and awesome power; the crushing force of the full weight of the sentencing authority of the federal government, being mechanically brought to bear upon John in this wholly unmeasured fashion.

For purposes of illustration, by the full degree of the accountancy-like calculations under the guidelines, with an Offense Level of 40 and a Criminal History Category of I, and without adjusting for acceptance of responsibility, the Guideline range for imprisonment is 292 to 365 months. That

is 24.3 years to 30.4 years. This is five to six times beyond the mandatory minimum and over seven times greater than the base offense level.

It is far beyond what some defendants even directly involved with actual minors receive, whether they are a mayor of a small local city, or by anticipation, the Speaker of the House. John did not attempt contact with a child, and believed he was in computer contact with another adult.

The base offense level of 22 here yields a range of imprisonment from 41 to 51 months. That range is only nine months below the statutory mandatory minimum of five years. These provisions nearly mirror each other in their judgment of the appropriate punishment for this offense.

Piled high on top of this, the enhancements *by themselves* add 26.17 years (314 months) to the base offense level already nearing five years. Even when adjusted downward three levels to a level 37, reflecting acceptance of responsibility, the resulting sentence authorizes 262 months. This adds 17.6 years (211 months) to the base offense level.

The primary matters presented for the Court's consideration at this Sentencing Hearing, are as follows:

## I. ADVISORY NATURE OF GUIDELINES

In light of *Booker, Crosby* and their progeny, the guidelines prohibitions and restrictions on downward departures under U.S.S.G. Chapter 5, Parts H and K, and pursuant to the Prosecutorial Remedies and Other Tools to end the Exploitation of Children Today Act of 2003 (the "PROTECT Act", Public Law 108-21) are not mandatory proscriptions, but are constitutionally merely advisory.

Some of these factors are affirmatively and specifically identified as permissible grounds upon which to downwardly depart within the sentencing guidelines and policy statements issued under section 28 U.S.C. 994(a). Further, some factors enumerated herein are not adequately taken into consideration by the sentencing commission in formulating guidelines and should result in a sentence different from that described, or result in a non-guidelines sentence.

## II. THE ENHANCEMENT UNDER U.S.S.G. §2G2 .2(B)(2) SHOULD NOT APPLY

There is multiple source evidence, testing and evaluation in support of the proposition that John Reap was not interested in children under 12 and that therefore the enhancement under U.S.S.G. §2G2 .2(b)(2) should not apply. The testing by Dr. Vallelonga indicates that John Reap is not interested in prepubescent children under 12. In fact, John Reap was interested in children who are adolescents older than 12. This is substantially, factually and empirically supported by the testing and conclusions of Dr. Vallelonga. The case of *U.S. v. Saylor*, 959 F.2d 198 (11th Cir. 1992), only in some respects factually similar to this case, lends support to this contention. This provides a basis on which to mitigate the effect of, or militate against, the two-level enhancement for this factor.

## III. DEPARTURE BASED UPON THE MENTAL HEALTH AND ABUSE

The granting of a downward departure based upon the mental health and physical health of a defendant, and a defendant's need for treatment with respect thereto, pursuant to U.S.S.G. §5H1.3 and U.S.S.G. §5K2.0 is warranted here. John Reap was sexually abused as a child as has been

substantiated in the records and reports of both the Veterans Administration Hospital medical records and in the report of Dr. Vallelonga. His upbringing did not include the guidance of a father and was instead subject to the constant, repeated maltreatment and abandonment by his mother.

This provides insight into the conduct of John Reap and places him in a category significantly different from that of persons who were not abused by a parent, nor sexually abused by others, as a child. The records of the Veterans Administration and Dr. Vallelonga's report are annexed hereto for the Court's consideration. The mental health history is also set forth in the Presentence Investigation Report in the three paragraphs numbered 61 through 63.

John Reap suffers from depression and has been prescribed Zoloft and Ambien for significant feelings of hopelessness and suicidal ideation. At the Veterans Administration Hospital in Syracuse, John Reap expressed his feelings of guilt, worthlessness and remorse. The diagnosis was major depression, acute stress disorder with dysthymia. The medications prescribed were Sertaline, Trazodone, and PRN Lorazepam. Also prescribed at the Oneida County Correctional Facility, are the medications of Remeron and Zyprexa.

In this regard, the Court is asked to take cognizance of, and credit, the thorough testing, evaluation and exhaustive report of Damien Vallelonga Ph.D. and its supported conclusions and un-controverted findings. Additionally, Dr. Vallelonga's report contains the most in-depth, exhaustive detailed presentation examination of John Reap's history which I have encountered.

## IV. VICTIM IMPACT STATEMENTS

The report of Dr. Vallelonga serves another important function. It must be viewed in relation to the two victim impact statements appearing in the Presentence Investigation Report. The statements are included and set out there in multi-page detail. One is written by an adult parent and the other is written by a 13-year-old child.

There is no authorship or attribution with respect to either statement. There is no statistical support, or accompanying study, nor any reports or evaluations from professionals in support of the anonymous statements. The purpose of the statements is nonetheless understood. The overall point of the victim impact statements is nonetheless well taken.

But the equation to be drawn from these victim impact statements doesn't work. It does not assimilate, and is ill-fitting to this case. The statements are attenuated, distant and remote from the specific case at hand. They therefore bear very little actual or specific meaning in this particular case.

However, there is presented to the Court here the real, direct, complete analysis and evaluation of John Reap by Dr. Vallelonga who confirms the sexual abuse of John Reap as a child, concludes that John is not a pedophile nor a psychopath, that John is not interested in children under 12, and most importantly is not likely to re-offend.

The victims do not know John Reap, but Dr. Vallelonga does, and from direct observation and evaluation of this individual.

## V. PERSONAL HISTORY AND BACKGROUND

The salient features of John Reap's history and background, including his military history, are that: John Reap is a 39 year old single male. He is the third of four children. His father was an Army Sergeant and his mother was a homemaker. His mother was born in Germany. His mother left his father when he was only about two years old and she divorced him. His father had a problem with alcohol and with compulsive gambling.

His mother began a relationship with a man who lived in Hawaii so she moved her family there. She broke up with that man, met another and moved everybody to Missouri. Subsequently, she took up with a man in the Endicott, New York, area and moved there.

John Reap saw his real father only two times after his mother divorced him. John Reap joined the Marines. He decided that he would visit his father on completion of boot camp. Three days before he was to graduate from boot camp, his father died.

John Reap characterized his mother as hard, controlling and un-affectionate. He attended seven different elementary schools as a result of his mother's several changes of residence. He was placed in a Learning Disability Laboratory Classroom and has some degree of dyslexia.

John went through three different schools for the fourth grade alone. He also repeated the fourth grade because he moved around so much. The other kids picked on him as he was always the new kid, and was smaller than average in height. He actually failed the fifth grade, but they did not hold him back.

When John was 15 years old, his mother was sent to school in Illinois as part of her Naval Reserve Training. This was supposed to last seven weeks. Before leaving, she gave to John two blank signed checks for emergency use and a small amount of cash. She also left him large envelopes

for him to mail her her bills. She left in a small refrigerator-freezer a supply of frozen meals that was supposed to last him the seven weeks. However, the training lasted *nine months* instead of *seven weeks*. John was completely on his own. His nearest relative was in Boston.

John's school eventually found out that he was living alone and reported the situation. He was placed in a foster home and then the home of the parents of his best friend. His mother did not return home upon learning that John had been made a ward of the state, and instead remained in Illinois for an additional five to six *months*.

John joined the Marine Corps in April of 1986. His first tour with a Marine Expeditionary Unit led him to sixteen countries. He was then stationed back at Camp Le Jeune until his unit was activated again and sent to the Gulf. He served his original four years. He then reenlisted. He served during the First Gulf War along with his older brother, Michael. John was a Corporal and his brother was a Sergeant. He and his brother did "horse-trading," which was against regulations and resulted in court martial. They both received bad conduct discharges.

Nonetheless, as can be seen from a copy of John's military discharge attached hereto, due to two separate tours of duty in service to the United States, and in two separate periods of the Gulf conflicts, he received several citations including: the National Defense Service Medal, Rifle Expert Badge, Southwest Asia Service Medal with Three Stars, Letter of Appreciation, and Sea Service Deployment Ribbon with Two Stars. This may seem overshadowed by the court martial and bad conduct discharge, but these years of service should not be wholly dismissed or overlooked as the substantial and meaningful contributions they represent in repeated voluntary service to this country.

Although John had dyslexia and attention deficit problems as a child, he was apparently never formally diagnosed as either hyperactive, or having an attention deficiency. He had never seen

a psychologist or psychiatrist, or been on psychotropic medication prior to June of 2005. He was deeply depressed after having been arrested in early June. He went to the Rome Veterans Administration Behavioral Health Clinic where he was diagnosed as suffering from an episode of major depression and he was given prescriptions for his insomnia and for anxiety.

He returned there a week later, and as a result of a credible report of suicidal ideation, was sent to the Syracuse Veterans Administration Hospital for inpatient admission because it was felt that he was not safe at home. On July 5, 2005 he was pulled out of the hospital and handed over to federal agents. Since then he has been incarcerated in the Oneida County Correctional Facility.

## VI. SUPPORT LETTERS

The Court is also asked to take cognizance of, and give due credit to, the support voiced for John Reap by those who know him better and longer than the government, the probation department, or defense counsel. The most important examples of these are as follow:

Kristi M. Falcone, the fiancé of John Reap, writes:

> **In the past two years that we've been together I have never seen John under the influence of drugs, and he only drank rarely. He doesn't smoke. I recently started hunting and wanted John to go with my father, brother and I. John refused to go. He absolutely refuses to carry a gun in the woods were to shoot a living being. He insists that if he wants me he will either go to the grocery store or get some venison from a friend. He doesn't need to kill something. He will go in the woods with us, but he will not haunt. His brother, Michael, says that he won't either.**

He is intelligent and wants to improve himself. Through the VESID program he went to MVCC and obtained his certificate in CNC machining. He made the president's list and graduated with a 4.0 GPA. His dream was to somehow go back into the Marine Corps as a reservist. It seems like all he ever talked about was when he was a Marine. This worried me. He told me that he felt like he didn't finish his job. He wanted so desperately to get back into the military that he even attempted to enroll in the French foreign Legion.

John has become very attached to my mother and father. He told me once that he talked to my father more in that day that he talked to his father in his entire lifetime.... he adored my parents. He was just learning how to open up to my parents when he was arrested. Now my mother visits with me (sic) every week in jail.

These past six months have been the worst of my life. I've gone through every emotion from one end of the spectrum to the other. I'm not standing behind John-nine standing beside him. When you stand behind someone you leave them open to face the bad stuff first. You are only useful if they fall backwards. When you stand beside them you face every thing head-on with them. They never doubt that you are still with them because they will see you. You can take their hand when they stumble and keep them from falling. This is what I am doing.

I am praying that John will be able to come home soon. We want a future together-in the near future-and a family. His psychiatric care and medications will be covered by the DEA for life. I own a home that we will live in, if the court will allow it. My parents fully support our relationship and shared my hopes that we will get married and raise a family. I guess I'm just hoping for mercy from the judge. A chance to get John straightened out so that he can make something out of his life. I can't imagine what I will do if John gets a prison sentence. I don't just love them-he is my best friend.

John and I know what we are facing. We know that our odds are not good. We appreciate everyone's help, and know that there are no guarantees. Whatever the outcome, we thank you all for your determination and dedication.

Sean Every, of Endicott, New York, writes as follows on behalf of John:

> **I have known John Reid for approximately 12 years. I've had the opportunity to view John in many social and personal situations including work, recreation, and family gatherings to state a few. His demeanor towards me and around me has always been one of protection and guidance, as when I met John I was about 11 years old. I've always known him to be hard-working and punctual; often taking on extra work that was not his to do. John is devoted to his friends and family, and again, protective and supportive in all their endeavors. In the years I've known John I have never observed any inappropriate behavior of any kind and view John as a well-adjusted and socially accountable adult. I would be happy to answer any questions or concerns about John's actions in the past.**

The Reverend Patrick E. Hilkey of the Assembly of God, who was also the Protestant Chaplin at the Oneida County Jail for seven and one-half years, writes:

> **I am writing a reference for John Reap. He has attended all of my services for the past several months and I'm very proud of the progress he has made. I believe he will do well back in society.**
>
> **He was always responsible for his actions and wants to change to better himself. He has not made excuses for his past but takes responsibility. I truly believe he will do well.**
>
> **I left the area about one month ago and now my former associate is the Chaplain at the jail and is pastoring my former church. I believe if he stays in contact, he has some overseers in his life, he will truly benefit. With accountability and a solid plan, I believe John will do well if released back into society.**
>
> **Please consider some action if at all possible over sending him to prison for a long period of time. I believe in John and I hope to see him again in the future.**

Linda Davis, a neighbor sharing the same building as John Reap, writes:

**For three or four years until May 2005 John rented and occupied an apartment attached to my house. During the time of his occupancy, I had occasion to encounter John frequently while he was working on his motorcycle in the shared garage the house, although I never once entered his apartment. We spoke often, sometimes at length in John was always respectful, pleasant, and enthusiastic about being an American, ex-Marine, and resident of Rome. He was extremely helpful to me when I needed help carrying heavy objects up and down the garage stairs, he helps me load and unload my kayak from my car, he was diligent about helping keep the driveway clear snow and ice, and in general was a gentleman in every way and someone on whom I felt I could depend.**

**The apartment is adjacent to my bedroom wall and never was there loud music, noise, TV audio, or partying, etc. I never had occasion to see John partaking of alcohol (he had copious quantities of empty Coca-Cola and Pepsi cans), and I was completely shocked and devastated when I learned of his arrest and incarceration. I couldn't believe the John I knew could be capable of most of the actions the media and grapevine had him guilty of, and I would hope to see him be able to lead a worthy and Christian life from now on.**

Finally, Donna J. Every, a co-founder of the Broome County Task Force on the Prevention of Child Abuse and Neglect, writes:

**I have known John Reap since 1992. I saw him almost daily and observed him to be utterly honest and reliable in his word and behavior in all dealings with me, my family mutual friends and acquaintances. In all this time I never ever saw him be drunk, violent, dishonest or out-of-control. I would literally trust him with my own or my son's life and reputation. He was a well-respected gunsmith yet did not personally hunt and kill animals. He was a very hard and reliable worker. Because I knew his daily schedule I know he did not miss or shirk work. I saw him also give unstinting support to his mother who was described to me as "difficult at best" by many including her son Michael and neighbors and friends of John who knew him as a teenager. Despite very long hours at his job, which included traveling across the southern tier of New York and down into Pennsylvania, John was**

patient and devoted to his mother. For example, he kept her walks clear of snow even though she was perfectly capable and had the tools and physical ability to do the job herself. He seemed to bear her no ill will despite her often angry and spiteful behaviors toward him.

Even though she had abandoned him as a young teen, resulting in Social Services removing him suddenly from his home and school district, he would do her favors not complaining when she would do things like put his few remaining personal effects (and small mementos from all the places they lived and his deceased grandmother who was his primary caretaker while his mother was working on cruise ships for months as (sic) a time) onto the porch in the rain if he did not comply with her wishes in a prompt enough manner to suit her. She would do this while he was out of town and call him and tell him the items were there. I saw him make many sacrifices of time, money and living arrangements to satisfy her demands. He went to schools from Hawaii, to Missouri and New York under some pretty trying circumstances related to abuse, supervision and financial difficulties. His mother's continual disagreements with those in authority led to John being moved from one school to another, sometimes two different religions in a row. But she apparently would not cooperate with school policies....

John was very devoted to his fiends and family and I hope you don't mind a few pertinent examples. The very first day I saw John take off work (though he never did before despite being feverish and with flu symptoms and a work injury requiring stitches) was to take me and my son Sean, who was having breathing problems, from Endicott, N.Y. to Dr. Bowen at Guthrie Clinic in Pennsylvania, and further to Vestal, NY to get a nebulizer and appropriate meds in place....

He also took off work to take me to an oncologist at Guthrie clinic and a surgeon in Pittsburgh and I received a sarcoma cancer diagnosis and said "we don't accept this diagnosis." I did get a reprieve at Roswell Hospital in Buffalo where I went with a girlfriend so John wouldn't lose his job. He was devoted to all close to him, even lending money to people who made more than he did....

Never ever was there a hint or suggestion of any inappropriate behavior from John to kids. I am a co-founder of the Broome County Task Force on the Prevention of Child Abuse and Neglect and have been to many, many workshops and am familiar with the deviant behaviors.

**I wanted to be concise and articulate and regret that this isn't very structured but I also passionately want to communicate what an honorable and good man we saw and still love and would like to see.**

## VII. U.S.S.G. §5K2.0 HYBRID OF FACTORS UNDER ADVISORY GUIDELINES

Alternatively, in the presence of a finding by this Court that the above-referenced downward departure factors, if individually considered, would not permit a downward departure, then this application is made nonetheless seeking such departure based upon the synergy of such factors working in combination with one another, and the same is warranted here.

It is respectfully submitted, pursuant to U.S.S.G. §5K2.0, that the same are sufficiently strong, in aggregation, to permit the Court to so act in the interests of justice.

The several, real, mitigating factors which are compellingly present in the instant case, differ significantly from the ordinary heartland of cases anticipated to be covered by the guidelines. The Court may *depart for factors already considered and contemplated by the guidelines*, if they render a defendant's adjusted guideline level inapposite in a particular case.

Also, when an already considered factor is present in a case to an acute degree, it is appropriate under such circumstances to depart downward. A hybrid of factors may also warrant a downward departure pursuant to §5K2.0 here under the *advisory* status of the guidelines.

Departure is permitted if there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the guidelines and should result in a sentence different from that described.

Such factors cannot, by their very nature, be comprehensively listed and analyzed in advance and must be determined by the sentencing court on a case-specific basis. A circumstance that is 'not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range may be relevant ... if [it] is present to an unusual degree and distinguishes the case from the heartland cases covered by the guidelines. Where an unusual constellation of factors exists that removes any sentencing from the heartland cases, district courts are obligated to consider departures even though no one factor, standing alone, might justify departure.

It is respectfully submitted that the case at bar, as described above, constitutes such a case authorizing downward departure under the advisory guidelines scheme.

Having addressed the guidelines, considered them, and made application for downward departure under them in their advisory capacity, this memorandum, in seeking an alternate non-guidelines sentence, turns to a consideration of the statutory sentencing factors contained in 18 United States Code §3553(a).

## 18 United States Code §3553(a) Factors

1. A sentence of the mandatory statutory five years, as prayed for, will be **sufficient, but not greater than necessary**, consonant with the purposes of sentencing, as statutorily set forth in *Title 18 United States Code §3553*; that is half a decade of federal incarceration followed by supervised release and continuing treatment.

2. A sentence of the statutory mandatory minimum period of five years, would be beneficial, advantageous and constructive given the **nature and circumstances of John's participation in this criminal offense, viewed in the context of the history and characteristics of this defendant including having a Category I Criminal History**. *18 United States Code §3553(a)(1).*

3. Such a sentence will **reflect the seriousness of the offense**. This federal felony conviction remains with John for the rest of his life. Given that he will experience a serious deprivation of liberty for at least half a decade of incarceration, at forty years of age, with respect to this offense, the mandatory minimum sentence will reflect, to all, that a prolonged deprivation of liberty, followed by ongoing supervision for a period of years, will result as a minimum for such conduct, even at this level of Criminal History Category. *18 United States Code §3553(a)(2)(A).*

4. Such a sentence will **promote respect for the law and provide just punishment** for this offense and this offender. *18 United States Code §3553(a)(2)(A)*.

5. Such a sentence of half a decade of federal incarceration, in conjunction with the felony conviction itself, is designed to **afford adequate deterrence to future criminal conduct** by this man. *18 United States Code §3553(a)(2)(B)*.

6. With such a sentence and subsequent supervision, the **public will thereby be protected from further crimes** of this defendant. *18 United States Code §3553(a)(2)(C).*

7. Also, under such a half decade-long federal sentence, John could immediately focus on receiving, and participating in, the greatly needed **educational and vocational training, or other correctional guidance and supervision, especially mental health counseling , provided by the Bureau of Prisons, in the most effective manner**, which will help prevent further criminal activity

by receiving further education and further training in an appropriate trade, exercisable upon release. *18 United States Code §3553(a)(2)(D).*

8. Such a sentence would also **demonstrate that sufficient consideration has been given to all of the kinds of sentences available.** *18 United States Code §3553(a)(3).*

9. Such a sentence would **take cognizance of the sentencing range established for this applicable category of offense and applicable criminal history category**. *18 United States Code §3553(a)(4)(A).*

## CONCLUSION

It is respectfully prayed that this Court sentence John Reap to a term of federal imprisonment of five years time, as required under the minimum mandatory sentencing imposed here by statute upon considering all of the matters presented herein and the factors contained in *18 United States Code §3553(a)*. In the alternative, we ask the Court to impose a non-guidelines sentence appropriate to all of the attendant circumstances, and consonant with this application.

Dated: November 25, 2006

                                          Respectfully submitted,

                                          *Norman P. Deep, Esq.*
                                          NORMAN P. DEEP, ESQ.
                                          Attorney for Defendant
                                          Office and Post Office Address
                                          Post Office 270
                                          Sherrill, New York 13202